IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AKSARBEN TRANSPORTATION, LLC, a Nebraska limited liability company d/b/a BLACKROCK TRANSPORTATION;<br><br>Plaintiff,<br><br>vs.<br><br>WHITELINE LOGISTICS, INC., a Mississippi corporation;<br><br>Defendant. | **8:26CV649**<br><br>**MEMORANDUM AND ORDER** |

This matter comes before the Court on Plaintiff's, Aksarben Transportation, LLC, doing business as Blackrock Transportation's ("Blackrock's"), motion for preliminary injunction. Filing No. 4. For the reasons set forth herein, the Court denies the motion for preliminary injunction.

## I. BACKGROUND

According to its verified complaint, Aksarben Transportation, LLC d/b/a Blackrock Transportation is a Nebraska limited liability company with its principal place of business in Nebraska, and its sole member is a citizen of Nebraska. Filing No. 1 at 1. Whiteline Logistics, Inc., is a Mississippi corporation. *Id.* Both companies are engaged in the business of freight brokering and transportation services. *Id.* at 2. A freight broker's customers are the companies with goods that require transport. The freight broker then hires carriers which it pays to haul the shipper's freight. Filing No. 1 at 2; Filing No. 12-11 at 2.

From 2022 to 2025, Whiteline's sole customer was Plumrose/JBS Swift. *Id.*; Filing No. 12-11 at 1–2. On or about December 18, 2022, Whiteline engaged Blackrock to assist

with brokering freight on behalf of JBS. *Id.* However, in October of 2025, JBS informed Blackrock it could no longer utilize Blackrock to broker JBS loads unless Blackrock was operating as an extension of Whiteline. *Id.* at 3. Accordingly, on October 29, 2025, the parties entered into a Non-Compete and Non-Solicitation Agreement whereby Blackrock would act as a subcontractor of Whiteline. Filing No. 1-1.

The agreement provided that Mississippi law governed it. *Id.* at 2. It first addressed the use of confidential information:

> Each party acknowledges that all customer lists, carrier databases, pricing structures, business methods, and related proprietary information and trade secrets belonging to the other party ("Confidential Information") shall remain the sole property of that party, and shall not be disclosed or used for any purpose except in the performance of this subcontracting relationship.

*Id.*

The agreement also contained a mutual non-compete provision and non-solicitation provision as follows:

> During the term of this Agreement and for twenty-four (24) months following the termination of this subcontracting relationship (for any reason), neither party shall, directly or indirectly, engage in freight brokering or competing logistics services using the other party's customers or carriers with whom they had contact through the subcontracting relationship, or otherwise utilize the other party's Confidential Information without prior written consent.
>
> . . . .
>
> During the same period, neither party shall:
> - Solicit or attempt to solicit the other party's customers, shippers, or carriers with whom they had contact during the term of this Agreement;
> - Divert or attempt to divert any such customer's business away from the other party;
> - Induce or attempt to induce any employee, subcontractor, or agent of the other party to terminate their relationship with that party.

*Id.* at 1–2.

Under this agreement, Blackrock began operating as Whiteline, including having its employees use Whiteline email addresses, to broker JBS's loads. Filing No. 1 at 3–5; Filing No. 12-1 at 2. Whiteline paid each carrier directly and paid Blackrock, as a vendor, a dispatch fee on each load Blackrock's staff dispatched on behalf of it. *Id.* Blackrock billed each fee on its own vendor invoice, identified by Whiteline load number. Filing No. 12-1 at 3.

Blackrock alleged Whiteline breached this agreement beginning in late 2025 when it began using Blackrock's carriers on its own, thereby bypassing Blackrock. Filing No. 1 at 5. Blackrock further alleged that on June 17, 2026, Whiteline attempted to hire a Blackrock employee in violation of the non-compete and non-solicitation agreement. *Id.*

Blackrock asserted causes of action for breach of contract, tortious interference with a business relationship, and misappropriation of trade secrets. It moved for a temporary restraining order and preliminary injunction. It estimated Whiteline had utilized 134 of its carriers without authorization, resulting in over $75,000 in damages. *Id.* at 6. It estimated it would incur an additional $300,000 in damages if Whiteline's actions continued.

The Court denied Blackrock's motion for temporary restraining order. Filing No. 7. It found Blackrock had established a likelihood of success on its breach of contract and tortious interference claims because it alleged Whiteline had stolen its carriers and attempted to hire its employee. Filing No. 7 at 6–7. However, it found no likelihood of success on its claim for misappropriation of trade secrets because it had not established what the alleged secret was. Moreover, the Court found that Blackrock had not established irreparable harm as to any of its causes of action because it alleged only

monetary losses. Filing No. 7 at 7–8. While Blackrock's attorney speculated that Blackrock may suffer reputational harm or loss of customers due to confusion over its arrangement with Whiteline, it proffered no evidence to support this assertion. Filing No. 7 at 8. The Court set a hearing for the motion for preliminary injunction and noted its determination on irreparable harm was subject to change if Blackrock produced additional evidence for the hearing.

Whiteline was served and permitted the opportunity to respond to the motion for preliminary injunction. As to the allegedly stolen carriers, Whiteline argued that the carriers were its own, acquired either prior to the subcontracting relationship commenced or which had contacted Whiteline directly rather than coming to Whiteline through Blackrock. As to the allegation it attempted to hire a Blackrock employee in violation of the non-compete, Whiteline's co-owner, Jody McLaughlin, testified that she had a conversation with a Blackrock employee about her unhappiness with her job and her recent threat to Blackrock that she would quit. Filing No. 12-10 at 2. McLaughlin told the Blackrock employee that "if for some reason she left, she should let us know if she quit." *Id.* McLaughlin did not make her a job offer or have any further discussions with the employee. *Id.*

The Court held the preliminary injunction hearing and allowed the parties additional time to supplement the record. Blackrock submitted an affidavit from its sole member, Mike Akins, including a list of carriers that signed carrier agreements with Whiteline that he asserted were brokered by Blackrock. *See generally* Filing No. 20; Filing No. 21; Filing No. 22. Whiteline responded with an affidavit from its employee, Chris Wilhite, who analyzed the carriers Blackrock presented. Filing No. 23-1. Wilhite averred that based

on Whiteline's email records, the majority of the carriers listed in Akins's affidavit and supporting exhibits had contacted Whiteline directly, either in response to a Whiteline posting or on their own. Filing No. 23-1 at 6–7.

## II. ANALYSIS

Blackrock seeks a preliminary injunction 1) enjoining Whiteline and all persons and entities acting in concert with it from using or disclosing Blackrock's confidential information; 2); enjoining Whiteline and all persons and entities working in concert with it from operating a competing business; 3) enjoining Whiteline and all persons and entities working in concert with it from soliciting or attempting to solicit Blackrock's customers, shippers, or carriers and diverting or attempting to divert business away from Blackrock; 4) enjoining Whiteline and all persons and entities working in concert with it from inducing or attempting to induce any employee, subcontractor, or agent of Blackrock to terminate their relationship with Blackrock; 5) requiring Whiteline and all persons and entities working in concert with it to comply with the obligations imposed upon them as stated in the parties' non-compete and non-solicitation agreement.

Federal Rule of Civil Procedure 65 allows the Court to issue a preliminary injunction upon notice to the adverse party. In deciding whether to issue a preliminary injunction, the Court considers: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (enumerating the four factors). "The party seeking such relief must satisfy a cumulative burden of

proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Id.*

**A. Likelihood of Success on the Merits**

The Court starts with the "most important" factor—Plaintiff's likelihood of success on the merits. *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023) (citing *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 463 (5th Cir. 2016) (Jones, J., dissenting)).

Blackrock first alleges Whiteline breached the non-compete and non-solicitation agreement. Under Mississippi law, "[a] breach-of-contract case has two elements: (1) 'the existence of a valid and binding contract,' and (2) a showing 'that the defendant has broken, or breached it.'" *Maness v. K & A Enters. of Miss.*, LLC, 250 So. 3d 402, 414 (Miss. 2018) (quoting *Bus. Commc'ns, Inc. v. Banks*, 90 So.3d 1221, 1224 (Miss. 2012)).

"Non-competition agreements have been viewed by [the Mississippi Supreme] Court as 'restrictive contracts [which] are in restraint of trade and individual freedom and are not favorites of the law.'" *Kennedy v. Metro. Life Ins. Co.*, 759 So. 2d 362, 364 (Miss. 2000) (quoting *Frierson v. Sheppard Building Supply, Co.*, 154 So.2d 151, 156 (Miss. 1963)). "Only when such agreements are reasonable will they be considered valid and upheld . . .." *Id.* "The validity and the enforceability of a non-competition agreement are largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope." *Id.* (citing *Empiregas, Inc. v. Bain*, 599 So.2d 971, 975 (Miss. 1992)).

The Court finds a likelihood that the restrictive covenants at issue here would be enforceable under Mississippi law. They were time-limited (for a twenty-four-month

period) and restricted to only the other party's customers. The Court therefore finds the provisions are likely specific, narrow, and reasonable enough to be enforceable against Whiteline.

However, the Court does not find Blackrock has established a likelihood of success in demonstrating Whiteline breached the agreement. Blackrock has not shown that the carriers it accuses Whiteline of stealing were "the other party's customers or carriers" as prohibited by the noncompete. Filing No. 1-1 at 1. Despite producing a list of 105 carriers it claims Whiteline stole, Blackrock has been unable to refute evidence from Whiteline that these carriers either had a preexisting relationship with Whiteline or reached out to Whiteline directly. At best, Blackrock's argument reveals a potential ambiguity in the contract with how "the other party's customers or carriers" may be interpreted. Does it mean any carrier that a Blackrock employee happened to have contact with while working under the subcontracting relationship? Or does it mean only a carrier Blackrock can prove had an independent pre-existing relationship with? At this stage, the Court need not and cannot answer these questions. What the pleadings and filings do show, however, is that Blackrock has not satisfied its burden of showing it is sufficiently likely to succeed on this claim for the purposes of a preliminary injunction.

For similar reasons, the Court also finds Blackrock has not established a likelihood of success on its claim for tortious interference with business relationships. To succeed on its tortious interference claim, Farm Credit must show: "(1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party

whose relationship or expectancy was disrupted." *Thompson v. Johnson*, 910 N.W.2d 800, 807 (Neb. 2018).[1] Without solid evidence that Blackrock was entitled to exclusivity or priority in the relationship with the specified carriers, there is no evidence that any potential interference was "unjustified."

Lastly, the Court does not find Blackrock has shown a likelihood of success on its claim for misappropriation of trade secrets. Blackrock brings its claim pursuant to the Nebraska Trade Secrets Act, Neb. Rev. Stat. § 87-501 et seq. The Act defines a trade secret as information that "[d]erives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and which "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Neb. Rev. Stat. § 87-502(4). Customer lists do not constitute trade secrets "to the extent that they embody information that is readily ascertainable through public sources." *First Express Servs. Grp., Inc. v. Easter*, 840 N.W.2d 465, 475 (Neb. 2013) (quoting *Home Pride Foods v. Johnson*, 634 N.W.2d 774, 782 (Neb. 2001)).

Blackrock has not shown that Whiteline obtained protected trade secrets from it. To the extent it claims the carrier contacts constituted trade secrets, Whiteline largely had independent access to this information through its own contact with the carriers. Additionally, Whiteline's employee, Wilhite, averred that carrier contact information is

---

[1] Blackrock asserts that Nebraska law should govern its non-contract claims, and Whiteline does not address the choice of law question. In any case, the standard is largely similar under either state's law, and would not change the Court's conclusion. *See PDN, Inc. v. Loring*, 843 So. 2d 685, 688 (Miss. 2003) (citing *MBF Corp. v. Century Bus. Commc'ns, Inc.*, 663 So.2d 595, 598 (Miss. 1995)) ("Under Mississippi law, a claim for tortious interference with business relations requires proof of the following four elements: (1) the acts were intentional and willful; (2) the acts were calculated to cause damage to the plaintiffs in their lawful business; (3) the acts were done with the unlawful purpose of causing damage and loss without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) actual loss and damage resulted.").

published by the federal government, meaning to the extent Whiteline did not already have the information, it was readily ascertainably through public sources. Filing No. 12-1 at 5. Accordingly, Blackrock has not met its burden to show a likelihood of success on the merits of trade secrets claim.

**B. Irreparable Harm**

Blackrock has also failed to show immediate and irreparable harm warranting injunctive relief.

To show immediate and irreparable harm, a party must show "that [it] is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citation omitted). "A showing of '[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.'" *Id.* (quoting *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980)).

In denying the temporary restraining order, the Court noted Blackrock had failed to demonstrate non-economic harm. It noted that its counsel speculated about potential reputational harm or customer confusion but had not proffered actual evidence of the same. Blackrock has still not met its burden on this front. After the denial of the temporary restraining order, it produced an additional affidavit from its employee Mike Akins claiming that carriers "stopped booking" with Blackrock after its agreement with Whiteline ended. Filing No. 20-1 at 3. Akins also produces a text exchange with a carrier date October 27 inquiring if Blackrock is still running loads of Whiteline, apparently as evidence that the

customer believed Blackrock was not, in fact, still running such loads. Filing No. 22-33 at 1.

The evidence of carriers ceasing their use of Blackrock and one carrier inquiring about Blackrock still running loads does not prove harm to Blackrock's reputation. There is nothing to tie the carriers who stopped using Blackrock to any wrongdoing by Whiteline as opposed to valid business reasons a carrier might make a change, or pure coincidental timing. Likewise, the text inquiry from the carrier does not demonstrate harm to Blackrock's reputation so much as a single question from one carrier. There is nothing to show what prompted this carrier's inquiry or what Blackrock's response to it led it to do. In sum, there is still no evidence from carriers or customers showing actual confusion or reputational harm. As before, the only evidence before the Court is evidence of strictly monetary harm: that Blackrock claims it has suffered $75,000 in damages and is likely to suffer an additional $300,000 if Whiteline's actions continue. Filing No. 1 at 6. These damages are easily compensable by an award of money damages after the case is resolved on the merits should Blackrock prevail. This factor weighs strongly against issuance of the preliminary injunction.

**C. Balance of the Harms**

The third factor the Court considers is the balance of harms. This factor is neutral. Both parties stand to suffer economic harm in the face of an adverse ruling. However, as explained above, this harm is easily compensable with money damages and thus does not support the necessity of a injunctive relief at this time.

**D. The Public Interest**

The fourth factor the Court must consider is the public interest. The public interest weighs slightly in Blackrock's favor. Specifically, the public interest favor enforcement of voluntary contract obligations. *See Union Nat. Life Ins. Co. v. Tillman*, 143 F. Supp. 2d 638, 646 (N.D. Miss. 2000) ("The public has an interest in not allowing parties to unilaterally breach binding contracts . . .."). However, this factor is not enough to outweigh those factors warranting strongly against issuance of the preliminary injunction as set forth above.

## III. CONCLUSION

For the reasons set forth herein, the Court finds Blackrock's motion for preliminary injunction should be denied.

IT IS ORDERED:

1. Plaintiff's motion for preliminary injunction, Filing No. 4, is denied.
2. Defendant shall answer or otherwise respond to the Complaint within 14 days of the date of this order. The Clerk of Court shall reset the answer deadline accordingly.

Dated this 24th day of November, 2026.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge